**PREMIERE DIGITAL ACCESS, INC., Plaintiff,**

v.

**CENTRAL TELEPHONE COMPANY, John Does I–X, and Roe Corporations XI–XX, Defendants.**

**No. CVS021015DAEPAL.**

United States District Court, D. Nevada.

Feb. 22, 2005.

See, also, 360 F. Supp.2d 1161, 2005 WL 580528.

Barry Levinson, Barry Levinson, Law Office Of, Kristian Johnson, Barry Levinson, Law Office Of, Las Vegas, NV, for Plaintiff Premiere Digital Access, Inc.

Elissa Cadish, Hale Lane Peek, et al, Michelle Allison, Hale Lane Peek, et al, Las Vegas, NV, for Defendant Central Telephone Company.

### ORDER VACATING ORDER OF THE MAGISTRATE JUDGE AND GRANTING MOTION FOR A PROTECTIVE ORDER

DAVID ALAN EZRA, Chief Judge.

The Court heard Defendant Central Telephone Company's motion on December 15, 2004. Kristian Johnson, Esq., appeared at the hearing on behalf of Plaintiff Premiere Digital Access, Inc.; Elissa Cadish, Esq., appeared at the hearing on behalf of Defendant Central Telephone Com-

pany. After reviewing the motion and the supporting and opposing memoranda, the Court VACATES the Order of the Magistrate Judge, and GRANTS Defendant's Motion for a Protective Order.

### BACKGROUND

#### A. *General Background of the Underlying Claims*

Plaintiff Premiere Digital Access, Inc., ("Premiere") is suing Defendant Central Telephone Company d/b/a/ Sprint of Nevada ("Sprint") for breach of contract, violation of the covenant of good faith and fair dealing, restraint of trade, and unconscionable contract. This case is before the Court pursuant to both 28 U.S.C. §§ 1331 and 1332; the complaint was filed by Plaintiff in federal district court pursuant to both 28 U.S.C. § 1331, as the case raises questions of federal law, and 28 U.S.C. § 1332, as there is diversity of the parties. Plaintiff Premiere is a Nevada Corporation; Defendant Sprint is a foreign corporation. Plaintiff seeks damages and injunctive relief.

Plaintiff Premiere is an internet service provider ("ISP") that had, prior to Plaintiff's dispute with Defendant, 800 third party customers who paid Plaintiff to provide them with internet access and services. On April 17, 2002, Plaintiff entered into an agreement with Defendant Sprint in which Sprint agreed to provide Premiere with circuits, phone lines, trunk lines, and phone or IP assignments—services which were essential to the running of Plaintiff's business.

Incorporated into this contract was Sprint's Acceptable Use Policy ("AUP"). The AUP prohibited Premiere or its customers from engaging in a list of uses, including "[p]roviding material that is, in the sole opinion of Sprint, threatening or harassing, profane, abusive, libelous, socially objectionable, unlawful, discriminatory, offensive, or protected by trade se-

crets." In the case of a violation, the AUP stated:

> Sprint reserves the right to remove content from its servers that, in Sprint's sole discretion, is in violation of this Policy. If activity in violation of this policy continues, then Sprint may suspend or terminate without notice Customer's Sprint Web Hosting Service, as Sprint deems necessary to prevent further violations.

In another section of the contract, entitled "Default/Termination," another passage regarding termination of services reads: " 'Default' shall mean ... fail[ure] within fourteen (14) days after written notice to remedy any breach of these terms and conditions. Upon Default by Customer, Sprint may terminate the services under this Agreement."

Defendant Sprint maintains that it received numerous complaints regarding three customers of Premiere—bulkers.net, bulkbarn.com, and web-promotions.com; the complaints indicated that these web sites were promoting methods of transmitting bulk junk e-mail. Sprint claims that prior to this period, it had already addressed the problems regarding these web sites with Premiere, at a time when Premiere was an indirect customer of Sprint by way of another provider. During their previous discussions, Sprint claims it specifically warned Premiere that the sites, as well as any others that sell bulk e-mail software of e-mailing lists, would be terminated. In July of 2002, Sprint states that it again contacted Premiere seeking a remedy to the problem of these three web sites. After Premiere failed to comply, Sprint terminated service to these sites. Premiere protested the termination.

Sprint asserts, however, that the complaints did not end with the termination of service to these sites, as Premiere customers continued to engage in prohibited prac-

tices, such as "spamming" and "spoofing" (the practice of forging e-mail header information to hide the source of the e-mail). On July 25, 2002, Sprint forwarded a "Three Day Termination Notice" letter to Premiere via certified mail, citing violations of the AUP. On July 29, 2002, Sprint terminated all services to Premiere.

Premiere claims that after Sprint terminated its services, Premiere's ISP business was completely shut down and all its clients have been lost. Premiere denies that its customers violated Sprint's AUP. Regardless, Premiere also contends that, even if its customers had engaged in prohibited practices, Sprint violated the contract by not giving Premiere fourteen days notice, during which time it could have remedied the problem. Plaintiff filed suit against Sprint on July 30, 2002.

Plaintiff's complaint seeks damages for breach of contract, violation of the covenant of good faith and fair dealing, trade restraint, and unconscionable contract. Plaintiff also seeks injunctive relief to force Sprint to resume providing services to Premiere. More specifically, Plaintiff asserts that, by terminating its service without 14 days written notice, Sprint has breached the contract. Plaintiff also argues that none of the violations on which Sprint premised termination ever occurred. To state a claim for violation of covenant of good faith and fair dealing, Plaintiff maintains there was a "special relationship" between Plaintiff and Defendant, and that Defendant's actions were "oppressive, wanton and willful." In support of its claim for restraint of trade, Premiere alleges that Sprint has completely eliminated its competition in the business of supplying ISPs with line access and equipment within the Las Vegas/Clark County area, and that Defendant now engages in monopolistic and unilateral practices. In arguing that the contract between Sprint and Premiere was unconscionable, Premiere alleges that Defendant refuses to negotiate regarding contract terms, and because of Defendant's monopolistic hold on the market, it forces ISPs to accept limitations on liability and damages that are "shocking."

### B. *Disclosure of the Allegedly Privileged Communication*

On September 25, 2002, counsel for Defendant Sprint produced 1,280 pages of documents as its initial disclosure under Federal Rule of Civil Procedure 26. Among these documents was a five-page string of e-mails between Sprint employees that included a forwarded e-mail from Sprint's in-house counsel. The e-mail exchange between the employees regarded Premiere and the decision to terminate the service of Premiere's customers. The forwarded e-mail, which had been written in January of 2002, contained in-house counsel's recommendation as to how Sprint should proceed in terminating the service of a different customer—the customer that had formerly been Premiere's service provider—due to similar violations of Sprint's policy. In that instance, in-house counsel recommended that Sprint give the offending customer five days' notice to cure the problem prior to termination.

Sprint alleges that it did not become aware of the disclosure until almost a year later, when mention of it was included in Plaintiff's response to Defendant's motion for summary judgment. Sprint maintains that the disclosure was inadvertent, and occurred due to the misstep of a new paralegal and the oversight of the attorneys supervising her. On July 29, 2003, Defendant sent a letter to Plaintiff seeking the return of the allegedly privileged documents; a redacted version of the e-mails was enclosed. On August 13, counsel for Premiere declined to return the documents claiming that the documents were not priv-

ileged, or alternatively that the privilege had been waived.

### C. *Defendant's Motion for a Protective Order*

Sprint filed a motion for a protective order on September 9, 2003. Premiere filed its opposition to the motion for a protective order on September 19. Defendant's motion sought an order requiring Plaintiff to return all copies of the allegedly privileged documents, and prohibiting Plaintiff from using any such information at trial or in any other respect. Defendant filed a reply in support of its motion on September 24. The magistrate judge issued an order denying the motion for a protective order on September 29. Reasoning that the burden of proof rests with the party asserting the privilege, and the privilege must be narrowly construed, the court held that counsel for defendant did not meet the burden of establishing the existence of the privilege.

Defendant filed a motion on October 20 requesting that the magistrate judge reconsider the order; Plaintiff Premiere filed its opposition to the motion on November 6. The magistrate judge denied Defendant's motion for reconsideration on December 3. Defendant filed the instant objection to the magistrate's order on December 22.

### STANDARD OF REVIEW

A district court may only set aside a magistrate judge's determination of a pretrial matter, subject to certain enumerated exceptions, if it finds the order to be "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); Fed.R.Civ.P. 72(a). Under the Local Rules, "[a] district judge may reconsider any pretrial matter referred to a magistrate judge in a civil or criminal case pursuant to [28 U.S.C. § 636(b)(1)(A)] where it has been shown that the magistrate judge's ruling is clearly erroneous or contrary to law." L.R. IB

3–1(a). Thus, the district judge must affirm the magistrate judge unless it is left with the "definite and firm conviction that a mistake has been committed." *Burdick v. Comm'r,* 979 F.2d 1369, 1370 (9th Cir. 1992). The reviewing court may not simply substitute its judgment for that of the deciding court. *Grimes v. City & County of San Francisco,* 951 F.2d 236, 241 (9th Cir.1991).

### DISCUSSION

The attorney-client privilege serves to protect confidential communications between a party and its attorney in order to encourage "full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. U.S.,* 449 U.S. 383, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). "A party asserting the attorney-client privilege has the burden of establishing the relationship and the privileged nature of the communication." *United States v. Bauer,* 132 F.3d 504, 507 (9th Cir.1997). The party asserting the privilege must, at a minimum, make a prima facie showing that the privilege protects the information the party intends to withhold. *In re Grand Jury Investigation,* 974 F.2d 1068, 1071 (9th Cir.1992).

Defendant argues that, under Federal Rule of Evidence 501, state law should govern this claim of privilege. The rule states that "in civil actions an proceedings, with respect to an element of a claim or defense as to which state law supplies the rule of decision, the privilege of a witness, person, government, state, or political subdivision thereof shall be determined in accordance with state law." Fed.R.Evid. 501. Because these e-mail communications go to the issue of notice and breach, which involve the state law claim for breach of contract asserted by Plaintiff, Defendant

reasons that state law should govern the claim of privilege.

The relevant state law, Defendant argues, is Nevada Revised Statute 49.095, which provides:

A client has a privilege to refuse to disclose, and to prevent any other person from disclosing, confidential communications:

1.  Between himself or his representative and his lawyer or his lawyer's representative.

2.  Between his lawyer and the lawyer's representative.

3.  Made for the purpose of facilitating the rendition of professional legal services to the client, by him or his lawyer to a lawyer representing another in a matter of common interest.

Nev.Rev.Stat. 49.095. Further, a communication is confidential if "it is not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication." Nev.Rev.Stat. 49.055. Defendant Sprint argues that the e-mails clearly fit these definitions.

Moreover, Defendant Sprint maintains that the privilege has not been waived. Nevada law provides:

A person upon whom these rules confer a privilege against disclosure of a confidential matter waives the privilege if he or his predecessor while the holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter.

Nev.Rev.Stat. 49.105. Sprint also cites a Nevada Supreme Court decision in which the court rejected the assertion that an attorney waived the privilege by discussing a conversation he had with his client. The court reasoned that, "[w]hile the attorney may claim the privilege on the client's behalf, only the client has the ability to waive it." *Manley v. State*, 115 Nev. 114, 121 n. 1, 979 P.2d 703 (1999). Based on these rules, Defendant Sprint concludes that it in no way consented to the disclosure of the e-mails, and that the disclosure occurred only through the mistake of counsel, who had no ability to unilaterally waive the privilege.

In its argument to the contrary Plaintiff Premiere cites two cases, one from the District of Delaware and one from the Southern District of New York, for the proposition that in cases involving both federal and state claims, the federal rules of privilege apply. *Sneirson v. Chemical Bank*, 108 F.R.D. 159 (D.Del.1985); *J.P. Foley & Co. v. Vanderbilt*, 65 F.R.D. 523 (S.D.N.Y.1974). Plaintiff also asserts the principle that in federal question cases, federal law governs privilege. *Kaufman v. Board of Trustees*, 168 F.R.D. 278 (C.D.Cal.1996). Based on these cases, and the fact that Plaintiff's complaint includes a federal restraint of trade claim, Plaintiff argues that federal law should apply.

Applying federal law, Plaintiff asserts that the e-mail was not privileged. Plaintiff argues that there is no communication involving a lawyer, because the communication was between two Sprint employees. The forwarded e-mail included in the communication was the equivalent, Premiere argues, of a verbal account of the attorney's advice told by one non-attorney to another. Plaintiff also argues that in-house counsel wasn't acting in his position as an attorney, because he was involved in the decision as to whether to terminate the service, and as such he was a percipient witness to the relevant events. Thus, because counsel was acting with a "business purpose" as opposed to a "legal purpose," Plaintiff concludes that no privilege attaches. (Def. Opp'n to Mot. for Protective Order at 6) (citing *United States v. ChevronTexaco Corp.*, 241 F.Supp.2d 1065, 1076

(N.D.Cal.2002)("The privilege does not protect an attorney's business advice.").)

The plain language of Rule 501 would appear to support Defendant Sprint's interpretation that the state law of privilege governs. However, a body of case precedent exists to support Plaintiff's contention that, in cases such as the instant controversy that involve both federal and state law claims, the federal law of privilege applies to both the state and federal claims. *See, e.g., Hancock v. Dodson,* 958 F.2d 1367, 1373 (6th Cir.1992); *Wm. T. Thompson Co. v. General Nutrition Corp., Inc.,* 671 F.2d 100, 104 (3d Cir.1982); *Harding v. Dana Transp. Inc.,* 914 F.Supp. 1084, 1090 (D.N.J.1996); *Wei v. Bodner,* 127 F.R.D. 91, 94 (D.N.J.1989), aff'd, 983 F.2d 1054 (3rd Cir.1992); *Aramburu v. Boeing Co.,* 885 F.Supp. 1434, 1437 (D.C.Kan.1995); *Perrignon v. Bergen Brunswig Corp.,* 77 F.R.D. 455, 459 (N.D.Cal.1978). Regardless, the Court finds that this distinction is not dispositive; under either Nevada law or federal law, the communication at issue is clearly protected by the attorney client privilege.

■ Preliminarily, the Court rejects Plaintiff's contention that the e-mail in question should be considered a communication between non-lawyers. The e-mail in question, the forwarded e-mail from in-house counsel, was drafted by a lawyer. This e-mail is severable from the non-lawyers' correspondence to which it was attached. Thus, the Court continues, with its analysis focused on this e-mail, and not the broader exchange of correspondence.

■ The Court finds persuasive Defendant's argument that the communication would be covered by the privilege under Nevada law. For purposes of the attorney-client privilege, under Nevada statutory law, an attorney is any person "authorized, or reasonably believed by the client to be authorized, to practice law in any state or nation." Nev.Rev.Stat. 49.065. Notwithstanding Plaintiff's arguments that in-house counsel is not covered by the privilege, the drafter of the e-mail in question, Roy J. Haverkamp, is licenced to practice law in Kansas, and is therefore an attorney for purposes of the privilege. (Haverkamp Decl. at 1.) The Nevada statutes define client, for purposes of the attorney-client privilege, as including a "corporation … [that] is rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services from him," and a representative of a client as meaning "a person having authority to obtain professional legal services, or to act on advice rendered pursuant thereto, on behalf of the client." Nev.Rev.Stat. 49.045; Nev.Rev.Stat. 49.075. The Court finds that the employees involved in the communication fit the definition of "representative" of the client, which is Sprint.

■ Thus, the e-mail is protected under Nevada law as a communication between a client's representative and a lawyer, so long as the privilege has not been waived. *See* Nev. Rev. Stat 49.095. The Court rejects Plaintiff's argument that the communication has a "business" purpose, and is therefore not covered by the privilege. As this client is a corporation, any advice sought by its representatives will obviously be, on some level, for the purposes of determining how that corporation should conduct its business. However, the Court finds that where, as here, the primary purpose of the communication is to discern the legal ramifications of a potential course of action, that communication is for a "legal" purpose. As the Nevada statutes and the precedent of the Nevada Supreme Court establish that waiver of the privilege may only occur due to a voluntary disclosure, and that disclosure must be made by the client, the Court finds that under Nevada law the privilege has attached and

has not been waived. *See* Nev.Rev.Stat. 49.105; *Manley*, 115 Nev. at 121 n. 1, 979 P.2d 703.

█ Moreover, the communication is also privileged under federal law. The Ninth Circuit has established that communications will be permanently protected from disclosure by the client or the legal adviser, so long as protection is not waived, if the following elements of the attorney-client privilege are present:

(1) legal advice of any kind was sought;

(2) the advice was from a professional legal adviser in his capacity as such;

(3) the communications was relating to that purpose;

(4) the communication was made in confidence; and

(5) the communication was by the client.

*Admiral Ins. Co. v. U.S. Dist. Court for the Dist. of Arizona*, 881 F.2d 1486, 1492 (9th Cir.1989) (citing *In re Fischel*, 557 F.2d 209, 211 (9th Cir.1977)).

Both the U.S. Supreme Court and the Ninth Circuit have acknowledged that, when the client is a corporation, special problems arise in applying this privilege. "As fictitious entities, corporations can seek and receive legal advice and communicate with counsel only through individuals empowered to act on behalf of the corporation." *Admiral*, 881 F.2d at 1492 (citing *Commodity Futures Trading Assoc. v. Weintraub*, 471 U.S. 343, 348, 105 S.Ct. 1986, 1990, 85 L.Ed.2d 372 (1985)). However, the precedent of the U.S. Supreme Court establishes clear rules for this Court in applying the privilege in this context. The Supreme Court has held that a corporation's in-house counsel qualifies as an attorney for purposes of the attorney-client privilege. *See Upjohn Co. v. United States*, 449 U.S. 383, 394, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) (holding that communications between corporate counsel and a corporation's employees made for the purpose of rendering legal advice are protected by the attorney-client privilege). Where communications are made between in-house counsel in his capacity as such and employees, in the scope of their employment and with the knowledge that they are speaking to in-house counsel for the purpose of securing legal advice, such communications will be protected from disclosure. *Upjohn*, 449 U.S. at 394–395, 101 S.Ct. 677. Within the framework of these guidelines, district courts are to determine the existence of the privilege on a case-by-case basis. *Upjohn*, 449 U.S. at 396, 101 S.Ct. 677.

The Court finds that this communication was made between a Sprint employee in the scope of his employment and Sprint's in-house counsel acting in his capacity as such for the purpose of securing legal advice. As aforementioned, the Court rejects Plaintiff's argument that in-house counsel for Defendant was acting in a purely "business" capacity in this instance. As is well established by the common law, the purpose of the attorney-client privilege is to foster openness between attorney and client to enable the attorney to give the most well-informed legal advice to the client. Accepting Plaintiff's argument would essentially render unprotected any communication that occurred between attorney and client prior to the start of preparation for litigation. Such a result would frustrate the purpose of the privilege, by stifling the attorney's ability to advise the client at the time when the attorney's advice is most useful—i.e., before the client takes an action that could ultimately lead to a costly dispute in the courts.

Having persuaded the Court of these facts, the Defendant has met its burden of proving the existence of the privilege. Moreover, the Court finds that the privilege has not been waived. Therefore, because the Court finds that the communica-

tion at issue was unquestionably protected by the attorney-client privilege, under both Nevada and federal law, the Court must find that the order of the magistrate judge was clearly erroneous and subject to reversal.

### CONCLUSION

For the reasons stated above, the Court VACATES the Order of the Magistrate Judge, and GRANTS Defendant's Motion for a Protective Order. The Court ORDERS that all copies of the privileged document be returned or destroyed, and that only an appropriately redacted version of the e-mail correspondence may be used by Plaintiff in these proceedings.

IT IS SO ORDERED.